171 So. 256

## GEORGIA POWER CO. v. EDMUNDS.

### 4 Div. 866.

Supreme Court of Alabama.

Oct. 15, 1936.

Rehearing Denied Dec. 17, 1936.

J. W. Brassell and Roy L. Smith, both of Phenix City, for appellee.

Denson & Denson, of Opelika, for appellant.

GARDNER, Justice.

Plaintiff recovered of the defendant, Georgia Power Company, a judgment for the destruction of his house and contents by fire. The gravamen of his cause of action rests in the alleged negligence of defendant in causing or allowing a wire or wires of its transmission line, while heavi-

ly charged with high-voltage electric current, to fall or come in contact with plaintiff's dwelling house, setting fire thereto and destroying the same.

The refusal to defendant of the affirmative charge, with hypothesis, constitutes the vital assignment of error here presented.

The fire occurred about 2 o'clock in the afternoon of February 2, 1935, on a clear day, with little, if any, wind blowing, nor outward signs of disturbance as to the transmission wires of defendant, which had been inspected January 11th preceding, and found to be in good condition.

Defendant's transmission line consisted of three wires strung on poles about 400 feet apart, with cross-arms thereon 24 feet in length, and the wires spaced about 12 feet apart. These wires were cables made of seven strands of copper wire, and were of like character to those used as transmission lines throughout Alabama and Georgia. They were installed in 1927, and have a life of 20 to 50 years.

Plaintiff's house, located in Russell county, was a two-room, unceiled, shingle roof, frame house, with no attic, but a loft, and the ordinary chimney. About six feet to the rear is a separate small house, the kitchen, and not far away a garage. Defendant's high-voltage line, running generally north and south, ran near plaintiff's dwelling, and what is referred to as the west wire ran immediately over the top of one corner, some of the witnesses saying that if it dropped from its place on the poles it would cut off about 18 inches of the corner. The middle wire was three feet or more away from the house, and the third still further distant easterly from the house. The span between the poles was 400 feet, the northern pole structure being about 150 feet from the house, and the southern, the more remote, 250 feet.

Plaintiff's testimony places the wires from 15 to 25 feet above the ground, and that for defendant from 40 to 45 feet. One of the occupants of the dwelling was Hattie Duncan, and it is upon her testimony, corroborated in large part by Jesse Johnson, who happened upon the scene at the time, that plaintiff's case in its essential aspect must rest.

In substance, this proof discloses that on the morning of that day there had been a fire in one of the rooms in the dwelling and in the kitchen, and when the fire originated no one was on the premises. Hattie Duncan was the last to leave the house, and was gone only a little while, and upon returning "across the field," she first saw the house burning—the fire being on the corner of the house over which the west wire was suspended, and this wire was then on the corner of the house, and she could hear it popping. The wire then left the house, swung to the branch of a tree, and then to the ground, where it popped and emitted sparks. The other wire (middle one) was on the garage, which also burned, afterwards falling to the ground and emitting sparks. Witness Hattie Duncan did not see the other ends of these two wires, but others testify they were on the ground south of the house, and parts thereof were preserved and offered at the trial. As to the distance of the nearest wire (west wire) above the house, this witness stated that "if you got on top of the house you could touch the nearest wire with your hands."

It appears, therefore, that the two wires were broken, the west and middle wires, to so designate them, and that the third or easterly wire—the greater distance from the house—was not broken. There is nothing in the proof indicating any mechanical defect in the wires or their attachment to the poles, nor any exterior disturbance of any character that would affect the wires, or that any of them had previously unduly sagged.

Plaintiff appears to have proceeded upon the assumption that this proof sufficed for a reasonable inference to be drawn that the wires first fell and ignited the house, and the learned trial judge evidently accepted that theory of the case.

It is, of course, the well-recognized rule that in no case is negligence assumed from the mere fact of an injury (Lawson v. Mobile Electric Co., 204 Ala. 318, 85 So. 257), and it is to be borne in mind also that it was not incumbent upon this defendant to show how the house became ignited (Blakeney v. Alabama Power Co., 222 Ala. 394, 133 So. 16), and that the scintilla doctrine prevailing in this state does not conflict with the well-known rule that a conclusion as to liability that rests upon speculation or mere conjecture is not the proper basis for a verdict. Continental Casualty Co. v. Paul, 209 Ala. 166, 95 So. 814, 30 A.L.R. 802; Southern R. Co. v. Miller, 226 Ala. 366, 147 So. 149.

As to this latter rule, this court, in Southern Railway Co. v. Dickson, 211 Ala. 481, 100 So. 665, 669, observed:

" 'Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.'

"But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence."

■ Here it would seem the evidence is without "selective application" as to plausible explanation of the origin of the fire. As to whether or not the fire originated from within the house or in some manner wholly disconnected with the wires and this caused the wires to fall and break by reason of the •heat, or whether the wires first broke and set fire to the house, are purely matters of conjecture and speculation. We cannot bring ourselves to the conclusion that the proof points to plaintiff's theory of causation, indicating a logical sequence of cause and effect. The one theory is, to our minds, as plausible and reasonable as the other, and the determination of that matter, from this proof, rests in speculation only. This conclusion renders inapplicable the doctrine of res ipsa loquitur, for "while the doctrine permits an inference that the known act which produced the injury was a negligent act, it does not permit an inference as to what act did produce the injury, and there can be no foundation for the application of the doctrine where the physical act or thing which caused the injury is unknown, or not disclosed," (45 Corpus Juris 1212) approvingly cited by this Court in Alabama Power Co. v. Bryant, 226 Ala. 251, 146 So. 602.

In the numerous cases found cited in the notes to City of Henderson v. Ashby, 14 A.L.R. 1018, and to Humphrey v. Twin State Gas & Electric Co., 56 A.L.R. 1011, there was some character of proof upon which a theory of negligence might be rested. These authorities of course recognize the high degree of care required as to such dangerous instrumentalities as electric transmission wires, but we do not read any of them as sustaining the application of the doctrine of res ipsa loquitur to facts and circumstances kindred to those here disclosed.

And an examination of the evidence offered by defendant adds weight to this conclusion, though not necessary perhaps here to be considered.

The testimony of experts, one of whom has for 20 years occupied the chair of Electrical Engineering at the Alabama Polytechnic Institute, and wholly disinterested, clearly indicates, as the most probable theory, that the two wires broke by reason of the heat from the fire. These wires appear to have been broken at about the same time and approximately the same distance from the two poles. The four ends of these fallen wires were preserved, and exhibited at the trial. They are forwarded here for our inspection. Each of these ends was darkened, spotted, and tapered, and at the tapering end the diameter is smaller than the body of the wire, as shown by the other end of the wire that was cut. The experts say these wire ends had been subjected to heat which had annealed or softened the wire, resulting in its elongation, diminishing its diameter, and so weakened the wire that it broke of its own weight. They further state that if these wires had broken by reason of some mechanical or other defect, and without consideration of the element of heat, the break would have been a clean sharp break, with no tapering at the ends and no softening or weakening of the wire. Their testimony further shows that in the event of a break as first above outlined, and one end had fallen on and hung to the house where there was fire, and the other end fallen to the ground, the end in the flame would have darkened and annealed, but the other end, not so subjected to the heat, would not show any such condition.

■ As previously observed, the wires were of the kind generally used throughout this state and Georgia, and no indication of defect is made to appear. The experts agree that any break in such wires (external cause eliminated) would be most

276

unusual, and if in fact such break did occur from some inherent defect, the likelihood is that it would be at or near the pole structure. The ends of the wires here exhibited for our inspection add corroboration to the expert testimony, and that they are genuine and not fabricated is established by undisputed proof, with no reason to question their source. So likewise as to the testimony of the experts. It bears no indication of any inherent improbability, nor does anything appear to have been presented that in any manner reflects thereon. But further elaboration we deem unnecessary. Suffice it to say we are of the opinion the affirmative charge was due to be given defendant, as duly requested, and that its refusal is error to reverse.

We have examined with care the authorities cited by plaintiff (Western Union Tel. Co. v. Jones, 190 Ala. 70, 66 So. 691; Briggs v. Birmingham Ry., Lt. & P. Co., 188 Ala. 262, 66 So. 95; Davidson v. Alabama Power Co., 203 Ala. 77, 82 So. 91), but find nothing in them out of harmony with the conclusion here reached.

For the error indicated, let the judgment stand reversed.

Reversed and remanded.

ANDERSON, C. J., and BOULDIN and FOSTER, JJ., concur.